**PORTLAND *v*. YICK.**

[75 Pac. 706.]

LEGISLATIVE JOURNALS—STATUTES.

1. Courts in Oregon will not question the enactment of an enrolled legislative bill, properly signed and filed, except to ascertain whether the records of the legislative bodies show that the constitutional requirements have not been fulfilled; and unless it affirmatively appears that the mandatory provisions of the constitution have been disregarded, the law will be sustained.

JUDICIAL NOTICE OF MUNICIPAL ORDINANCES AND JOURNALS.

2. Municipal courts, and the circuit courts on trials *de novo* on appeal from them, will take judicial notice not only of the ordinances of a city, but of such journals and records of the common council as affect their validity, meaning, and construction, just as state courts take official notice of the public statutes of the State and the journals of the legislature.

PROCEEDINGS OF COMMON COUNCIL—SHOWING IRREGULARITY.

3. To impeach an apparently regular municipal ordinance, it must affirmatively appear from the records which the charter requires to be kept (mere silence of the record not being sufficient) that the charter provisions relative to the adoption of ordinances have not been complied with.

METHOD OF KEEPING MINOR RECORDS NOT REQUIRED BY CHARTER.

4. Minor records of a municipal council, not prescribed by the charter, but made by direction of that body for its guidance, may be kept as it may direct, as,

for example, by entering the votes on slips and pinning them to the ordinances, and need not be entered in the journal.

MUNICIPAL POWER UNDER CHARTER TO SUPPRESS LOTTERIES.

5. The power to suppress gaming and gambling houses is broad enough to sustain a prohibition against keeping any place for the purpose of selling lottery tickets.

SUFFICIENCY OF PENAL ORDINANCE—LOTTERIES.

6. A penal ordinance is sufficient if it prohibits certain acts and imposes a penalty for commiting them, it need not necessarily declare them unlawful in terms.

ORDINANCES—NECESSITY OF ATTESTING.

7. The signing or attesting of an ordinance by the city auditor is not essential to its validity, in the absence of a charter requirement.

From Multnomah : MELVIN C. GEORGE, Judge.

Wing H. Yick was convicted of a violation of an ordinance of the City of Portland, relating to lotteries, and appeals.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Cicero M. Idleman* and *Mr. Almon C. Palmer.*

For respondent there was a brief over the names of *Lawrence A. McNary,* City Attorney, *Joseph J. Fitzgerald,* and *John P. Cavanaugh,* with an oral argument by *Mr. Fitzgerald* and *Mr. Cavanaugh.*

MR. JUSTICE WOLVERTON delivered the opinion.

The defendant was convicted in the Municipal Court of the City of Portland of the violation of Ordinance No. 11,336, and appealed to the circuit court, wherein he was again convicted, and now appeals to this court. He is charged with the violation of section 2 of the ordinance, which provides:

"No person or persons shall within the corporate limits of the City of Portland set up or keep, either as owner, proprietor, keeper, manager, or employé, with or without hire, lessee or otherwise, any house, shop or place for the purpose of selling any lottery ticket, certificate, paper or instrument, purporting or representing, or understood to be or to represent, any ticket, chance, share or interest in or depending upon the event of any lottery."

Section 6 provides for the punishment of any violation

of the ordinance by fine or imprisonment, or both. When the city offered evidence at the trial in the circuit court it was met with the objection by the defendant that the ordinance had not been adopted in the manner provided by charter and the rules governing the common council, and was therefore void and inoperative. None of the records of the common council relative to the adoption of the ordinance were introduced in evidence, but the court was asked to take judicial knowledge thereof, and thereby determine the validity of its adoption. Under section 27 of the city charter of 1898 (Laws 1898, pp. 101, 108), the common council was authorized to adopt rules for the government of its members and its proceedings. It was required, however, to keep a journal of its proceedings, and upon the call of any two of its members to cause the yeas and nays to be taken and entered in the journal upon any question before it. In pursuance of this charter regulation, the following among other rules were adopted, viz:

"Rule 26. No standing rule as provided by this ordinance shall be rescinded or suspended, except by vote of two-thirds of all the members present, and the ayes and nays shall be recorded on any motion to suspend a rule.

"Rule 27. Every ordinance shall receive three readings previous to its being passed, but shall not be read more than twice at any one meeting. * *."

The journal shows that the ordinance was read the first time and second time by title, and, on motion of Councilman Harris, duly seconded and carried, Rule 27 was suspended, the ordinance read a third time by title, placed upon its final passage, and passed by 11 yeas, giving the names of the councilmen voting yea. The ordinance has this attestation at the bottom:

"Passed the Council, March 21, 1900.

A. N. Gambell, Auditor.

"Approved, March 22, 1900.

W. A. Storey, Mayor."

On the back there are attached two slips, each containing the names of the councilmen, with the words, "Yeas," "Nays," at the top in separate columns. One of them bears at the top the notation in pencil, "Suspension Rule 27," and opposite each name in the column headed "Yeas" a perpendicular pencil mark. The other bears at the top the word "Passage," with a like mark opposite each name in the column headed "Yeas," thus indicating that Rule 27 was suspended by a unanimous vote, and the ordinance passed by a like vote, the latter showing the vote to be the same as recorded in the journal.

1. Preliminarily, it is urged that the courts will not take judicial knowledge of the acts of the common council leading to the adoption of an ordinance, but only of the text or provisions of the ordinance. It will be noted that the charter regulations relating to the keeping of a journal by the common council are almost identical with the requirements of the state constitution for the government of each house of the legislative assembly. This court said in *State* v. *Rogers*, 22 Or. 348, 364 (30 Pac. 74), Mr. Justice BEAN announcing the opinion: "In *Currie* v. *Southern Pac. Co.* 21 Or. 566 (28 Pac. 884), we held that the court will take judicial knowledge of the journals of the legislature for the purpose of impeaching the validity of the enrolled act on file with the Secretary of State; and when from such journals it affirmatively appears that the bill as filed in the Secretary of State's office did not in fact pass the legislature, the courts will refuse to recognize it as a valid law; but every reasonable presumption is to be made in favor of the legislative proceedings; and when the constitution does not require certain proceedings to be entered in the journal, the absence of such a record will not invalidate a law. It will not be presumed, from the mere silence of the journal, that either house has exceeded its authority or disregarded constitutional require-

ments in the passage of legislative acts." The bill which
was the subject of controversy in that case passed the
house and was amended in the senate. When returned
to the house that body concurred in the amendments.
This was shown by the journal, but it did not show that
the bill as amended was read section by section on the
final passage, nor that the vote was taken by yeas and nays,
as required by article IV, § 19, of the constitution. Con-
ceding that the yeas and nays should have been thus taken
in that instance, the court further say : " We must assume,
in the absence of a showing to the contrary, that the con-
stitutional requirements were observed, and hold that the
act under consideration was constitutionally passed." In
the Currie Case, alluded to in the opinion of the court in
*State* v. *Rogers*, 22 Or. 348 (30 Pac. 74), the bill went to the
senate after passing the house, and the journal shows that
it was put upon its final passage, when it received 13 yeas
and 11 nays. There were five absent and one senator was
excused ; "so," continues the record, "the bill failed to
pass." There was an affirmative showing that the bill
failed to pass, and the court took judicial cognizance of
the record in the journal, and declared the act inoperative.

The same principle was announced in *McKinnon* v. *Cot-
ner*, 30 Or. 588, 591 (49 Pac. 956). The bill in that instance
passed the house, went to the senate, and was amended by
the addition of section 8, being an emergency clause, and
passed, when it was returned to the house and the amend-
ment concurred in. This is all shown by the journals of
the two houses, but no other reference is made therein to
the bill, except to show that it was duly signed by the pre-
siding officers. The enrolled act so signed was approved
by the Governor, filed in the office of the Secretary of State,
and published among the general laws, but it did not con-
tain section 8, and the act was held valid because it no-
where appeared in the journals that the act did not pass

in the form actually signed by the presiding officers and as found on file in the office of the Secretary of State. In all these cases, if we are rightly informed, the court took judicial knowledge of the state of the record as shown by the journals in the two houses, without the necessity of their introduction in evidence. Indeed, the general rule seems to be that courts will take judicial notice of the contents of the journals and other records of legislative bodies, required to be kept by the fundamental law, which may in any manner affect the validity or the meaning and proper construction of an act. But further than this they will not go, and they will not take judicial cognizance of any fact that is without legal potency to affect the validity of the act or to explain its meaning or construction: 17 Am. & Eng. Enc. Law, (2 ed.) 928, 929; *Division of Howard County*, 15 Kan. 194; *People* v. *Mahaney*, 13 Mich. 481; *Green* v. *Weller*, 32 Miss. 630; *Somers* v. *State*, 3 S. D. 321 (58 N. W. 804); *Ritchie* v. *Richards*, 14 Utah 345 (47 Pac. 670); *McDonald* v. *State*, 80 Wis. 407 (50 N. W. 185). Under the doctrine of this court it will not look behind the enrolled bill having the signatures of the presiding officers of the two houses and filed in the office of the Secretary of State, except to determine whether it appears affirmatively from the records of those bodies that the mandatory provisions of the constitution have not been observed in the enactment; and, unless it does so appear, the law will not be declared invalid. Mere silence of the journals as to such a requirement will not suffice to overthrow it, unless it might be in a case where the constitution requires an entry in the journal, as the presumption will then obtain that the legislature proceeded regularly and properly. Such being the ascertained rule and doctrine, the further solution of the present problem is not difficult.

2. The municipal courts will take judicial notice of the

ordinances of the municipality and of such journals and records of the law-making body as affect their validity, meaning, and construction in like manner and for like purposes as the courts of the State take judicial cognizance of the public statutes of the State, and, in the event of an appeal to the circuit court, although by the rules of law the case is to be tried *de novo*, the circuit court will take like judicial notice of such ordinances as the municipal courts. We are not saying that it will not do so upon any other principle, but it will upon this, which suffices for the determination of the present controversy : *City of Solomon* v. *Hughes*, 24 Kan. 211; *Downing* v. *City of Miltonvale*, 36 Kan. 740 (14 Pac. 281); *State, for use* v. *Leiber*, 11 Iowa, 407; *Town of Laporte City* v. *Goodfellow*, 47 Iowa, 572; *Town of Moundsville* v. *Velton*, 35 W. Va. 217 (13 S. E. 373).

3. The charter as to the common council stands in the same relation that the constitution does to the two houses of the legislative assembly, and, if the ordinance in question is to be impeached or overthrown, it must appear affirmatively from the journal of the common council that the mandatory provisions of the fundamental law relative to the passage of the ordinance have not been observed. The courts will not look into minor records that the council may require to be kept to determine whether the rules which it has adopted for the orderly dispatch of the business before it have been complied with, and whenever it is not affirmatively shown by the journal (mere silence of the record not amounting to such a showing) that the charter provisions relative to the adoption of the ordinance have not been complied with, the ordinance in controversy must be deemed to have been regularly adopted. Now, the ordinance under consideration appears affirmatively from the journal to have received a majority vote of all the members of the common council. This was sufficient to indicate its adoption : Laws 1898, pp. 101, 109, § 30.

4. The record as to the suspension of the rules is not required by the charter to be kept in the journal, and, if it were at all material to the present controversy, the record of the yeas and nays on the suspension of the rules kept by the common council upon slips attached to the ordinance is amply sufficient to show a compliance with the rules. It was the method employed by the common council for keeping the record, and, being by it deemed sufficient for the purpose, the courts will not intervene to hold it void.

5. It is next contended that the common council was not empowered to adopt the ordinance. The delegated power is "to prevent and suppress gaming and gambling houses, or places where any game in which chance predominates is played for anything of value." This is unquestionably broad enough to authorize the common council to prevent the setting up or keeping of any house or place for the purpose of selling lottery tickets or certificates depending upon the event of a lottery, which is essentially the purpose of section 2 of the ordinance in question. The setting up or keeping of such a house is in itself an overt act, and constitutes the offense, the object of the charter being to prevent and suppress gambling houses. Lottery, it has been held, is a gaming device (*Ex parte Kameta,* 36 Or. 251, 60 Pac. 394, 78 Am. St. Rep. 775), and the keeping of a house for the purpose of selling lottery tickets is as much within the spirit and intendment of the charter as if it was kept for any other kind of gambling.

6. Another objection urged to the ordinance is that the acts prohibited thereby are not declared to be crimes or misdemeanors, or even to be unlawful. A penalty, however, is prescribed for their violation, and this is all that is necessary to notify persons of the unlawful character of the offense.

7. The next and last objection preferred is that the audi-

tor did not attest the ordinance as "Auditor of the City of Portland," as he is styled in the charter: Laws 1898, pp. 101, 119, § 46. Manifestly, the answer to this is that neither the signing nor the attestation of the ordinance by the auditor is essential to its validity under the charter. It might be, and no doubt is, convenient, and perhaps essential, to identify the ordinance in its transmission to the mayor and return to the council body that he attest it, or place upon it his file mark; but we are not aware that any such formality is required in order to complete its perfect enactment, so as to give it the force of law.

These considerations affirm the judgment of the trial court, and such will be the order of this court.

AFFIRMED.

Decided 14 March, rehearing denied 13 June, 1904.